Argued 5 April, decided 12 June, rehearing denied 17 July, 1906.

### STATE *r.* MIZIS.

85 Pac. 611, 86 Pac. 361.

CHANGING VENUE—DISCRETION—APPEAL.

1. An application for a change of venue under Section 1250, B. & C. Comp., is addressed to the discretion of the trial court, and its ruling thereon is reviewable on appeal only for an erroneous exercise of its power resulting in a substantial injury to the defendant, which was not the case here.

POSTPONING TRIAL—DISCRETION—APPEAL.

2. The trial court acts under a discretion in passing on applications for postponements of trials, and its decisions will be reviewed on appeal only when there has been a disregard of the rights of the applicants, and in the present instance the application was wisely refused.

ELEMENTS OF THE CRIME OF RIOT.

3. Under B. & C. Comp. § 1913, which defines riot as the use of any force or violence, or any threat to use force or violence, by three or more persons acting together and without authority of law, if accompanied by immediate power of execution, it is not necessary that the three persons do the same act, but the offense is committed if the required number of

individuals have a common purpose to do the act complained of or assist one another to that end, in the manner named, though the individual act of each was separate from that of the others.

RIOT—KIND OF PROOF OF COMMON PURPOSE.

4. Positive direct proof of the common purpose of rioters is not required, but the intent of the parties and the required community of action may be inferred from the circumstances and from the actions of the persons implicated.

EVIDENCE OF RIOT.

5. The evidence of the occurrences charged here is entirely satisfactory to a moral certainty that the defendants were rioters as claimed.

APPEAL—OBJECTIONS NOT MADE AT TRIAL.

6. Objections to evidence not made at the trial are not available on appeal. For example: An objection to impeaching testimony that it was not proper for that purpose will not support an argument that the witnesses did not appear to be qualified.

DEFINITENESS OF TECHNICAL OBJECTIONS.

7. What may be termed technical objections to evidence should always be specific, in justice to the adversary and the court.

TRIAL—STRIKING OUT EVIDENCE.

8. Ordinarily it is not reversible error to refuse to strike out evidence, though improper, unless it was properly and seasonably objected to.

INSTRUCTIONS CONSIDERED AS A WHOLE—RIOT.

9. The instruction on a given point in a charge must be read with the balance of the instructions.

For instance: In a riot case an instruction that each of the defendants must have been "acting in conjunction with not less than two other persons in committing the act" is not open to the objection that it does not limit the "two other persons" to those implicated in the disturbance, where the court elsewhere charged that before any defendant could be convicted it must be found beyond a reasonable doubt, "not only that such defendant participated in the alleged riot, but that at least two of the other persons whose names are stated in the indictment were present at the time the riot occurred, if one did occur, and were acting in concert with the defendant, and that they assembled with a common intent to do the act charged in said indictment." The apparent narrowness of the first charge disappears when the entire charge is considered.

PUNISHMENT FOR RIOT.

10. Under Section 1914, B. & C. Comp., providing that if a felony or misdemeanor shall be committed in the course of a riot, any person participating therein shall be punished in the same manner as a principal in such felony or misdemeanor, and that any participant in such riot who shall carry a dangerous weapon, shall be punished by imprisonment in the penitentiary, every participant in a riot is liable to a penitentiary sentence if any one participant carries a dangerous weapon. In this case the defendant, though unarmed, was present aiding and encouraging others who were committing assaults with dangerous weapons, and was properly sentenced as though he had himself been armed and had committed an assault.

From Douglas: JAMES W. HAMILTON and LAWRENCE T. HARRIS, Judges.

Statement by MR. CHIEF JUSTICE BEAN.

The defendants Tom Leorges and Peter Demas, together with James Pilantes and Anton Mizis and three others, whose names were to the grand jury unknown, were indicted for riot. They were all Greek laborers, engaged with some 75 or 80 of their countrymen in repairing the track of the Southern Pacific Co. at or near Glenbrook, a station about 30 miles south of Roseburg. They were under the charge of foremen and lived in "outfit cars," which, for about a week prior to the commission of the alleged crime, had been standing on the siding at Glenbrook. About 10 o'clock on the night of October 10, 1905, an extra freight train "headed in" on the siding to clear the main track for the north-bound passenger train then about due. It coupled onto the outfit car nearest the switch and pushed it and those connected with it down against the other cars with such force and violence as to cause considerable damage to the furniture and belongings of the occupants. This so enraged the Greeks that a large number of them rushed out of the cars, ran down the track toward the freight train armed with guns, pistols, and other firearms, and began a general fusillade at and in the direction of the freight train and its crew. The fire was returned by one of the brakemen, who secured a gun from a house nearby, and some shots were fired by the foreman. There were fired in all from 75 to 100 shots. During the difficulty the wife of the foreman was killed and one of the Greek laborers injured. The passenger train arrived a short time after the difficulty commenced, when it ceased, and the Greeks returned to their cars. The freight train then backed down to the nearest station and the county officers at Roseburg were notified of the trouble, and the sheriff sent a posse in charge of a deputy to the scene of the difficulty, who arrested and brought all the Greeks to Roseburg, where they were confined in a warehouse guarded by the state militia who had been ordered out by the county judge at the request of the sheriff.

The circuit court, with a grand jury, was in session, and the grand jury, after an investigation of the matter, returned an indictment on the 19th against the defendants for riot, charg-

ing, among other things, that being armed with dangerous weapons, namely, shotguns, pistols and rifles, they made a felonious assault with such weapons on Jesse L. Woodson and Jesse McCulloch, the engineer and fireman of the freight train, by shooting at them. The defendants were arraigned and given until the next morning at 8.30 o'clock to plead.

At that time they appeared by counsel, entered a plea of not guilty, and moved for a change of venue, on the ground that they could not expect a fair and impartial trial in the county. This motion was supported by and based upon the joint affidavit of the defendants and the affidavits of Mr. Voicly, the deputy consul for Greece, residing in San Francisco; Andrew Papageogopulos, and John Marandas, two Greeks residing in Portland; the latter being a labor agent of the Southern Pacific and Oregon Railroad & Navigation Companies. The affidavit of the defendants states that they are natives of Greece employed by the Southern Pacific Co., and had been so employed for a long time; that there is a strong prejudice among the people of the county against them and their fellow countrymen being so employed, and that such feeling was greatly intensified by the trouble at Glenbrook, that immediately after such trouble they, in company with other of their fellow workmen, were arrested and brought to Roseburg, where they had since been confined and held in custody under guard of the militia; that a large number of persons were in attendance upon the circuit court at the time they were taken to Roseburg, and that the matter of the alleged riot had been discussed by every one in the city, and reports thereof, garbled and in the main untrue, had been carried all over the county by persons in attendance upon the court and by the daily and weekly newspapers of the county and of the city of Portland; that by such means the alleged riot had been given great publicity throughout the entire county to the prejudice of the defendants; that members of the regular panel of jurors had been in Roseburg since the difficulty and had, as affiants believed, conversed with the witnesses for the state and other persons pretending to know the facts in relation thereto, and had freely expressed opinions

concerning the same prejudicial to affiants; that, on account
of such reports and of the publicity given the matter, there is
great prejudice in the county against the affiants; and that
they could not obtain a fair and impartial trial therein.   Mr.
Voicly says in his affidavit that he came to Roseburg in re-
sponse to a telegram advising him that 84 Greeks in the employ
of the Southern Pacific Co. were under arrest; that upon his
arrival he found them confined in a warehouse guarded by the
militia; that he made diligent inquiry among the prisoners and
citizens of the county and ascertained that there is a strong
prejudice against the defendants, on account of which it would
be impossible for them safely to go to trial; and that he did
not believe a fair and impartial trial could be had in the county.
Papageogopulous states that he came to Roseburg on the 11th
of October after the difficulty at Glenbrook; that when he first
came he secured a room at a hotel, but when it was discovered
that he was a Greek he was compelled to vacate and was unable
to obtain another until aided by the sheriff; that during his
stay in Roseburg he had found a prejudice among the people
against the Greeks so intense that in his opinion the defendants
could not secure a fair and impartial trial in the county.

Marandas' affidavit was substantially to the same effect as
the others.   He attaches thereto articles from the Roseburg
papers giving an account of the difficulty.   One of these is from
the Roseburg Review.   It is headed:

### "DEATH IN A RIOT.

#### "Wife of Section Foreman at
Glenbrook Killed.

##### "IS MRS. JOHN A. PETERSEIN.

"Freight Train Jolts Cars Occupied by
Greeks Who Open Fire—One
Wounded by Brakeman."

It proceeds to say that, during a riot of Greek section hands,
precipitated by the severe jolting of their cars by the freight
train, the wife of the foreman was killed and a Greek injured;
that the Greeks to the number of 83 were arrested and brought
to Roseburg that day and were quartered in the Josephson

warehouse, where they were closely guarded by the militia pending an investigation; that the body of the foreman's wife was also brought and taken to the undertaker's, where an autopsy was held; that complete and accurate details of the difficulty were hard to obtain, but according to reports the Greeks became enraged because the cars occupied by them were struck with unusual severity by the freight train, and armed with rifles, revolvers and shotguns, swarmed out of the cars and made a rush for the freight train, and the engineer and fireman were driven from the engine by a fusilade of bullets which riddled the cab; that the rest of the freight train crew were obliged to flee for safety; that one of the brakemen ran to a nearby house, secured a rifle and returned to the train, giving battle to the Greeks, when he fired four shots, so the story goes, wounding one of the Greeks and causing the rest to disperse; that the foreman and his wife, attracted by the shooting, went to the door of their car to look out, when suddenly three shots were fired in quick succession, one of which pierced the breast of the woman, instantly killing her; that the identity of the person who fired the shot could not be ascertained, but the belief prevails that it was intended for the foreman and was fired by one of the Greeks, as threats had been made against his life; that, as soon as the news of the riot reached Roseburg, a posse of 28 men and a deputy sheriff and the city marshal left in a special train; that when they arrived at Glenbrook they found the Greeks in bed and everything quiet; that the Greeks were brought to Roseburg and unloaded from the cars about noon and placed in the warehouse in charge of the militia, which had been ordered out for the occasion by the county judge at the request of the sheriff; that an autopsy would be held that afternoon and the inquest on the morrow.

Another article was from the Roseburg Plaindealer of the 12th, the headlines of which were:

"DRUNKEN GREEKS ATTACK AND
                    KILL THE FOREMAN'S WIFE.
"While Under the Influence of Liquor They Create a Bad
                    Disturbance at Glenbrook, With
                    Disastrous Results."

It states that seldom has Roseburg been more aroused than it was by the trouble at Glenbrook Tuesday night; that Foreman Petersein had an extra gang of Greeks surfacing the road, and they went on a big drunk, quarreled with Petersein, and finally cornered him in his car, and, when he attempted to defend himself, shot and killed his wife, who was at his side; that about that time an extra freight train came along and a regular warfare began, the engineer being kept busy dodging bullets until Brakeman Johnson got a rifle from the caboose and began firing in the air, when the Greeks scattered and the trouble soon subsided. It then gives an account of the sheriff's posse going to the scene of the trouble, the arrest and bringing of the Greeks to Roseburg on the special train; that by the time the train arrived at Roseburg a large crowd had congregated at the depot expecting to see trouble, but that the Greeks were meek and submissive and were not in a fighting mood; that the members of the militia were much in evidence and rendered the sheriff valuable assistance in handling the crowd and getting the prisoners to the warehouse, where they will camp until the trouble is over and they are discharged; that several ladies were at the train and seemed to take much interest in the matter; that every available space on top of box cars, warehouses and elsewhere was filled by the crowd to see the sheriff search the prisoners as they were marched up by the soldiers; that it was an orderly crowd, and, although there was thought to be ground for lynching, there seemed to be a desire for the law to take its course, all hoping that the guilty ones would be amply punished. The article then states that an autopsy was had on the remains of Mrs. Petersein, and that the inquest was then in progress and would likely continue throughout the day; that in the meantime the militia had the prisoners in hand, and had kept them safely through the night before, although it was rumored that they would be dynamited; that during the afternoon the 83 Greeks were being marched by the militia to the coroner's inquest and from there to the grand jury room.

Another article was from the Roseburg Review of the 17th, with headlines as follows:

### "NO FOREIGN LABOR.

"Local Merchants Association
Goes on Record.

"RESOLUTIONS ARE PASSED

"Asking S. P. Co. to Displace Its Alien
Laborers in Douglas County
With Americans."

It states that, in accordance with the prevailing sentiment throughout the community, the Merchants' Protective Association has passed certain resolutions, which were published in full, requesting the Southern Pacific Co. to remove all gangs of foreign laborers from the county because they were disposed to insulting conduct on the streets and public highways, to committing larceny from the farmers and those living in the vicinity of their camps, and manifested a general disrespect for law and order.

The remaining article was from the Review of the 19th, purporting to be a reprint of an article from a Portland paper. It was headed:

### "AS VIEWED BY TRAINMEN"

and was to the effect that investigation of the trouble had revealed the startling fact that every caboose is an arsenal, and that every freight brakeman and engineman on the road wears a 44-caliber Colt's revolver strapped to his body, as the train crews believed their lives to be in danger from the excitable and ignorant Greeks; and have therefore for some time been taking precautions to defend themselves in any emergency that might arise.

In refutation of the proofs submitted by the defendants in support of their motion for a change of venue, the State filed the affidavit of five of the seven grand jurors that returned the indictment against the defendants, the affidavits of the sheriff and his deputy, and the affidavit of 106 citizens of the county, to the purport and effect that they were each and all residents of the county and were familiar with the feeling and sentiments

of the people in reference to the crime charged against the defendants, and that in their opinion a fair and impartial trial could be had in the county. Upon this showing the court overruled the motion. The defendants then moved for a postponement of the trial until the "next regular term" of the court. This motion was based upon the affidavits previously filed for a change of venue, and the additional affidavit of the defendants' counsel to the effect that neither they nor the defendants were advised of the charge until the indictments were returned late in the afternoon of the 19th; that the defendants were immediately arraigned and given until the next morning at 8:30 in which to plead; that Messrs. Fullerton & Orcutt were not retained as counsel until late in the afternoon of the day the indictments were returned; that the brief time since the arraignment had been consumed in preparing and submitting the motion for a change of venue, and therefore counsel had had no time, since being informed of the nature of the charge, in which to confer with their clients or prepare for the defense. This motion was likewise overruled, and the defendants required to go to trial immediately. The defendant Mizis demanded a separate trial, and it was commenced on the 20th. Seven of the jurors were secured from the regular panel and the remaining five from a special venire of 15. On the 23d a verdict of guilty was returned against him, and the trial of the other defendants jointly commenced. The record discloses no special difficulty in securing a jury. Georges and Demas were convicted on the 25th and the defendant Pilantes acquitted. Motions for new trials in each of the cases were overruled, and judgment entered on the verdicts, and defendants appeal. The two appeals were argued and submitted as one, and will be so treated for the purposes of the decision. The points relied upon for reversal will be noted in the opinion.

AFFIRMED.

For appellants there were briefs and oral arguments by *Mr. Frank G. Micelli, Mr. James Corwin Fullerton* and *Mr. Albert Newton Orcutt.*

For the State there was a brief over the names of *Andrew*

*M. Crawford,* Attorney General, and *George M. Brown,* District Attorney, with oral arguments by *Mr. Brown.*

MR. CHIEF JUSTICE BEAN delivered the opinion.

1. The first point relied upon for reversal is that the court erred in overruling the motion for a change of venue. Where an action for a felony is at issue upon a question of fact, the place of trial may be changed, when it appears by affidavit to the satisfaction of the court that a fair and impartial trial cannot be had in the county where the action is brought: B. & C. Comp. § 1250. But an application for that purpose is addressed to the discretion of the trial court, and its action in granting or refusing the same will not be disturbed on appeal, unless there is manifestly an erroneous exercise of such discretion to the substantial injury of the accused: *State* v. *Pomeroy,* 30 Or. 16 (46 Pac. 797) ; *State* v. *Savage,* 36 Or. 191 (60 Pac. 610, 61 Pac. 1128) ; *State* v. *Humphreys,* 43 Or. 44 (70 Pac. 824) ; *State* v. *Armstrong,* 43 Or. 207 (73 Pac. 1022).

Upon the showing made in the case there was, in our opinion, no abuse of discretion. The affidavits in support of the motion were all made by non-residents who had been in the county but a few days, and, in the nature of things, could not have been familiar with the general public sentiment. On the contrary, the affidavits filed by the prosecution were by officers, citizens and residents of the county, who all state that they were familiar with the public feeling, and that in their opinion a fair and impartial trial could be had in the county. This view was subsequently confirmed by the fact that no particular difficulty seems to have been experienced in securing a jury. It is true the newspaper articles made a part of the record were inaccurate in many particulars and somewhat sensational, but they were not particularly inflammatory or calculated to so prejudice the citizens of the county against the defendants as to prevent a fair and impartial trial.

2. The next contention is that the court erred in overruling the motion for a continuance. The grounds of the motion were the alleged excited state of the community and the want of

sufficient time for counsel for the defense to prepare for trial. The postponement of a trial, like that of a change of venue, rests in the discretion of the trial court, and its ruling will only be reviewed for abuse: *State* v. *O'Neil,* 13 Or. 183 (9 Pac. 284) ; *State* v. *Hawkins,* 18 Or. 476 (23 Pac. 475) ; *State* v. *Howe,* 27 Or. 138 (44 Pac. 672) ; *State* v. *Fiester,* 32 Or. 254 (50 Pac. 561). A defendant in a criminal action is entitled as a matter of right to the aid of counsel and to a suitable time after he is informed of the nature of the accusation against him to prepare for trial, and, if the application in this case had been for a postponement for a reasonable time for such purpose, quite a different question would have been presented to the trial court. But the application was to postpone the trial for the term, which would have taken it over until the following January, and there was not sufficient reason shown for such a delay. If counsel desired more time in which to prepare for trial, they should have so advised the court and asked for a postponement for that purpose, and it would probably have been granted. Having confined their application to a request for a continuance for the term, there was no reversible error in denying it.

3. At the close of the State's case, defendants moved the court to direct an acquittal, for the reason that there was no proof of the commission of the crime of riot, or that either of the defendants participated therein. Whatever the definition of a "riot" may be at common law or in other jurisdictions, it is thus settled here by statute:

"Any use of force or violence, or any threat to use force or violence, if accompanied by immediate power of execution, by three or more persons acting together, and without authority of law :" B. & C. Comp. § 1913.

To constitute a crime under this statute, there must be: First, the use of force or violence or threats to use force or violence, accompanied by immediate power of execution; second, such force or violence or threats must be by three or more persons acting together; and, third, they must be acting without authority of law. It is, of course, not necessary that the three persons should do the same act in the sense that what one does must be identical with what is done by each of the others to

constitute an "acting together," within the meaning of the statute. It is enough if they have a common purpose to do the act complained of or are engaged in aiding and assisting one another to accomplish such common purpose, although the individual act of each may be separate from that of the other. Otherwise riot is an impossibility. For, as said by Mr. Justice STEPHENS, in *Prince* v. *State,* 30 Ga. 27: "It is impossible that the action of each shall not have a certain individuality which will distinguish it from the action of all the rest. In tearing down a house, for instance, one rioter breaks down a door, and another breaks down a window, and a third merely hands a crowbar to one of his associates. Here each one's act is different from the acts of the others, and the act of one of them has in it nothing of violence. But there is an obvious legal sense in which they all do the same act. The common intent, which covers all the individual parts in the action, cements those parts into one whole, of which each actor is a responsible proprietor. The part performed by himself is his by perpetration, and the parts performed by the others, in execution of the common intent, are his by adoption. The principle is that each one adopts the performances of all the rest and adds them to his own, and thus does the whole, in the sense of the definition, so long as they are acting in execution of the common intent, but no longer."

4. Nor is it necessary that there should be direct and positive proof of a common purpose, or that the parties should deliberate beforehand or exchange views before entering upon the execution of their design. The purpose and intent may be inferred and found by the jury from the circumstances and the acts committed by them: *United States* v. *McFarland,* 1 Cranch, C. C. 140 (Fed. Cas. No. 15,674) ; *United States* v. *Peaco,* 4 Cranch, C. C. 601 (Fed. Cas. No. 16,018) ; *Astor Place Riot Case,* 11 Daly, 1.

5. Now, let us apply these principles to the testimony and see whether there was any evidence of a riot and of the defendants' participation therein. Mr. Petersein, the foreman of the gang to which the defendants belonged, testified that, about the

time of the difficulty, he was returning from a nearby house,
accompanied by his wife and Assistant Foreman Claudfelder,
and as he approached the railroad track he saw a brakeman hav-
ing some difficulty with his men;.that he went to his car, got
his rifle and fired several shots into the air and ordered the men
to return to their cars, but they did not do so and continued
down the track toward the engine; that he immediately heard
perhaps 25 or 30 shots fired near or about the engine of the
freight train, and from 75 to 100 shots in all, and there was
quite a difference in the volume of the sound; that on his way
to his car he saw the defendant Mizis armed with a gun in a
crowd going in the direction of the engine; that Mizis said they
had broken his stove and he was going "to kill the son of a
bitch"; that he could not say whether all his men were out of
the cars or not, but that most of them were.  Claudfelder said
that, as he and Petersein came onto the right of way, he looked
down the track toward the freight train and saw quite a body
of men moving in that direction; that he started to his own car,
and, as he did so, passed a number of men going north and
recognized Mizis, who was armed with a pistol and said they
"had broken his stove and he was going to kill" them; that he
saw a number of guns and pistols flash in the moonlight, and
just had time to get to his car, when he heard a. great number
of shots fired in the vicinity of the engine of the freight train,
and there was a difference in the volume of the reports; that
he was acquainted with Georges and Demas, as they both be-
longed to Petersein's gang, but he did not see either of them
that night.

    McCulloch, the fireman of the freight train, testified that, at
the time the train pulled in on the siding and stopped, the de-
fendant Georges and 10 or 15 other men came up to the gang-
way of the engine, and Georges said to the engineer, "Come
down, you son of a bitch, if you want to fight," and that he
would kill him; that several shots were fired at the engine be-
fore witness left it, three passing through the witness' window
and one through that of the engineer and the glass was broken
out of the front of the cab; that witness examined the engine

(48th Or.—12)

the next day and found marks of bullets and shot, which indicated that the firing had been done from the front. Woodson, the engineer, testified that, about the time or soon after his train came to a stop on the siding, somebody commenced shooting at the engine; that the firing first came from the right side of the cab through the front door and then from the left side; that a number of Greeks, none of whom he recognized, came to the engine, and one of them put his hand on the side of the tank and said to witness, "Damn son of a bitch, I kill you," and invited him to get down from the engine and was mumbling something about upsetting a stove or something of that kind; that, after several shots had been fired at the engine, witness jumped down and started to run toward the caboose, and some one commenced shooting at him and kept it up until he fell into a ditch which crosses the track; that at least eight or nine shots were fired at him from the time he left the engine until he reached the ditch, and that more than 100 shots were fired in all that night; that he examined the engine the next morning and found the shots came through the doors in front, and he also found the impress of a large bullet on the main reservoir under the fireman's seat and grains of shot in the cab and tank box.

Johnson was a brakeman on the freight train, and testified that after the train pulled in on the siding he heard shots up front, and, supposing the head brakeman was having some trouble with "hoboes," started in that direction and met the defendants Georges and Demas in company with several other persons; that Georges grabbed him by the arm and inquired if he was the conductor, and, being answered in the negative, asked where the conductor was, and was told that he was in the caboose; that Georges said, "I kill the conductor," and, "I kill you, you son of a bitch," and slammed him up against a car; that witness broke away from Georges and started to run toward the caboose, and when he got about two car lengths from it some one commenced firing at him, and he dodged between the cars and over to the other side of the train and ran to the caboose and told the conductor that if they found him they

would kill him; that the conductor went out the front door of the caboose, and witness out the rear and ran for the track-walker's shanty; that shots were fired at him all the time he was going there; that at the time Georges told the witness that he would kill the conductor, Demas was standing at his side mumbling something which the witness did not understand; and that Georges and Demas seemed to be the leaders of the crowd, but witness could not say whether either of them was armed or not. Gallings, the conductor of the freight train, testified that, after he was advised by Johnson to leave the caboose, he started to run toward the trackwalker's shanty, and on the way he met Georges, who wanted to know if he was the conductor, and, being answered in the negative, said he would "kill the son of a bitch," and started on toward the caboose; that Georges was armed with a gun of some kind at the time, and although witness did not see any other persons he heard others talking nearby.

There was much additional testimony as to the general character of the difficulty, the number of shots fired, and the like, but this is sufficient to show that there was abundant evidence tending to prove the use of force and violence by three or more persons acting together and without authority of law, and hence the crime of riot; and that the defendants Georges, Demas and Mizis were either actively engaged in such riot or present aiding and assisting others to commit the crime.

A claim is made that the proof does not show that there was any community of action between the defendants, or that either of them did the shooting at the fireman and engineer as charged in the indictment, or assisted, aided or encouraged the same. But there was sufficient proof on both of these points to take the case to the jury. Mizis, in company with a crowd of his fellow countrymen, was seen approaching the engine armed with a gun and was using threatening language toward the trainmen just before the firing began. Georges was at the engine about that time threatening the life of the engineer, and Demas was shown to have been in the crowd a few minutes later actively participating in the difficulty. So the jury were justified in finding

that they were acting together and with a common purpose, and that they either did the firing at the engineer and firemen, or induced or encouraged others to do it. "Riot" is a compound offense, to constitute which there must be a joint action of three or more persons. But all who aid, encourage or promote it by words, signs or other acts are principals and jointly guilty of the offense. It is not necessary that a party should commit some personal violence or do some other physical act, but any act of assistance or encouragement is sufficient to make him a principal. If he is busy while the riot is in progress in guiding, directing, inciting or encouraging others to commit acts of violence, he is as guilty as the instrumentalities he puts in motion.

6. The defendants testified as witnesses in their own behalf. And, for the purpose of impeaching them, the State called Petersein, Claudfelder and Wonacott, who each testified that the general reputations of the defendants for truth and veracity were bad. No objection was made to this testimony when offered or to any of the questions propounded to the witnesses, except the question asked Petersein if he knew the general reputation of Georges for truth and veracity, and the objection then made was that the question was incompetent, immaterial and irrelevant. After the testimony of each of these witnesses had been admitted, counsel moved to strike it out, on the ground that it was not proper impeaching testimony, and an assignment of error is based on the overruling of this motion. The objection now made to the testimony is that the witnesses were not shown to be competent to testify as to the general reputations of the defendants for truth and veracity in the community where they resided. But, as such an objection was not made when the testimony was offered, it cannot avail the defendants at this time.

7. A technical objection which goes to the form of a question or to the competency of a witness to testify as an expert, or on a question of character, should be specific so as to apprise the court and opposite party of the ground of the objection, that they may act accordingly.

8. And, as a general rule, it is not error for a trial court to

refuse to strike out evidence, although immaterial or irrelevant, which has been admitted without objection at the time it is offered: 12 Cyc. 565.

9. It is also claimed that the court erred in instructing the jury that each of the defendants must have been "acting in conjunction with not less than two other persons in committing the act," because the jury might naturally infer that any two persons would answer the requirement. The instruction quoted, however, must be considered in connection with that portion of the charge in which the court told the jury specifically that, before they should convict either of the defendants, they must find beyond a reasonable doubt, "not only that such defendant participated in the alleged riot, but you must also find that at least two of the other persons whose names are stated in the indictment were present at the time the riot occurred, if one occurred," and "were acting in concert with said defendant, and that they assembled with a common intent to do the act charged in said indictment."

There are objections to other parts of the charge, but they are mere verbal criticisms and do not affect the merits.

Finding no error in the record, the judgment is affirmed.

AFFIRMED.

Decided 17 July, 1906.

## On MOTION FOR REHEARING.

MR. CHIEF JUSTICE BEAN delivered the opinion.

10. It is insisted that, because there was no evidence tending to show that Demas carried at the time of the riot a dangerous weapon, he can be punished only by imprisonment in the county jail or by fine. The statute providing the punishments for riot is as follows:

"If any person shall be guilty of participating in any riot, such person, upon conviction thereof, shall be punished as follows:

(1) If any felony or misdemeanor was committed in the course of such riot, such person shall be punished in the same manner as a principal in such crime;

(2) If such person carried, at the time of such riot, any species of dangerous weapon, or was disguised, or encouraged

or solicited other persons who participated in the riots to acts of force or violence, such person shall be punished by imprisonment in the penitentiary not less than three nor more than fifteen years;

(3). In all other cases, such person shall be punished by imprisonment in the county jail not less than three months nor more than one year, or by fine not less than fifty nor more than five hundred dollars:" B. & C. Comp. § 1914.

Under this statute, if a felony or misdemeanor is committed in the course of a riot, any person participating therein is to be punished in the same manner as a principal in such felony or misdemeanor, or if the person participating in the riot carries a dangerous weapon at the time, he shall be punished by imprisonment in the penitentiary not less than three nor more than 15 years. In all other cases—that is, where no felony or misdemeanor is committed or where the defendant does not carry a dangerous weapon—the punishment shall be by imprisonment in the county jail or by fine.

Now, in this case the indictment and the proofs show that in the course of the riot an assault with a dangerous weapon was committed upon Woodson and McCulloch, which constituted either a felony or a misdemeanor, and therefore the punishment of any person participating in such riot was the same as that provided by Section 1771, B. & C. Comp., for an assault with a dangerous weapon, which is by imprisonment in the penitentiary not less than six months nor more than ten years, or by imprisonment in the county jail not less than one month nor more than one year, or by fine not less than $100 nor more than $1,000. It seems to us clear, therefore, that the defendant Demas was subject to imprisonment in the penitentiary, although he did not carry at the time of the riot a dangerous weapon. He was present, aiding, assisting and encouraging his codefendants to commit an assault with a dangerous weapon, and is liable as a principal. The petition is denied.

AFFIRMED: REHEARING DENIED.