Argued January 16; affirmed January 28, 1936

# STATE *v.* ALLEN ET AL.

(53 P. (2d) 1054)

*B. A. Kliks,* of McMinnville, for appellants.

*Earl A. Nott,* district attorney, of McMinnville, for respondent.

RAND, J. Wayne Allen, John Nichols and Ruby Jones were jointly indicted with five other persons for the crime of riot. They, with three of the others named in the indictment, were jointly tried and the three defendants were convicted, the others being acquitted. Wayne Allen and John Nichols were each sentenced to imprisonment in the county jail for Yamhill county and Ruby Jones was committed to the Oregon State Industrial School for Girls for a term of not more than three years. From this judgment, said defendants have appealed.

The defendants' main contention is that the acts proved were not sufficient to constitute riot and that, if the proof was sufficient to constitute the crime, it was not sufficient to show that the defendants, or either of them, had participated in its commission.

Our statute, section 14-601, Oregon Code 1930, provides:

"Any use of force or violence, or any threat to use force or violence, if accompanied by immediate power of execution, by three or more persons acting together, and without authority of law, is riot."

following which is a definition of what constitutes an unlawful assembly. No question is raised as to the sufficiency of the indictment. It charged both an unlawful assembly and the facts constituting the commission of the crime, both of which were sufficiently charged in the indictment.

Before considering the testimony, reference will be made to the interpretation which has been placed upon this statute by the former decisions of this court. In *State v. Mizis,* 48 Or. 165 (85 P. 611, 86 P. 361), the court said:

"To constitute a crime under this statute, there must be: First, the use of force or violence or threats to use force or violence, accompanied by immediate power of execution; second, such force or violence or threats must be by three or more persons acting together; and, third, they must be acting without authority of law. It is, of course, not necessary that the three persons should do the same act in the sense that what one does must be identical with what is done by each of the others to constitute an 'acting together', within the meaning of the statute. It is enough if they have a common purpose to do the act complained of or are engaged in aiding and assisting one another to accomplish such common purpose, although the individual act of each may be separate from that of the other. Otherwise riot is an impossibility. For, as said by Mr. Justice Stephens, in Prince v. State, 30 Ga. 27: 'It is impossible that the action of each shall not have a certain individuality which will distinguish it from the action of all the rest. In tearing down a house, for instance, one rioter breaks down a door, and another breaks down a window, and a third merely hands a crowbar to one of his associates. Here each one's act is different from the acts of the others, and the act of one of them has in it nothing of violence. But there is an obvious legal sense in which they all do the same act. The common intent, which covers all the individual parts in the action, cements those parts into one whole,

of which each actor is a responsible proprietor. The part performed by himself is his by perpetration, and the parts performed by the others, in execution of the common intent, are his by adoption. The principle is that each one adopts the performances of all the rest and adds them to his own, and thus does the whole, in the sense of the definition, so long as they are acting in execution of the common intent, but no longer.'

''Nor is it necessary that there should be direct and positive proof of a common purpose, or that the parties should deliberate beforehand or exchange views before entering upon the execution of their design. The purpose and intent may be inferred and found by the jury from the circumstances and the acts committed by ·them; [citing cases]."

In *State v. Seeley*, 51 Or. 131 (94 P. 37), the court said:

"* * * And it is not necessary that there should be direct and positive proof of a common purpose, or that the persons engaged in the riot should determine beforehand upon doing an unlawful act. The purpose and intent may be implied from the conduct and acts of the parties."

In *State v. Stephanus*, 53 Or. 135 (99 P. 428, 17 Ann. Cas. 1146), it is said:

"* * * True, in order to maintain a conviction for a riot, such facts must be established as will include an 'unlawful assemblage', as defined by the statute; that is to say, three or more persons, when acting in such manner as to be guilty of riot, are necessarily unlawfully assembled, and come within the statutory, as well as common-law, definition thereof, and while the assemblage in the first instance may not have been unlawful, it does become so upon the commission of such acts of violence as will constitute a riot."

Underhill on Criminal Evidence, (2d Ed.), section 489, defines riot as follows:

''Where three or more actually do an unlawful act of violence, either with or without a common cause or

quarrel, as, if they beat a man, or do other unlawful act with force, or even a lawful act, as removing a nuisance, in a violent and tumultuous manner, it is a riot. There must not only be a common intent to do an unlawful act or some lawful act in a violent manner but also concert of action. An unlawful assembly must be proved. Then whatever act will constitute a trespass may substantiate a charge of riot. The defendant's connection with the unlawful assembly must be shown by evidence satisfactory to the jury. His purpose and intent may be inferred from the circumstances. As soon as it is proved, he will become responsible for all the acts and declarations of the others made during the progress of the riot. If during the riot some one is killed, it is not necessary to prove that he struck the fatal blow. It is sufficient to prove that some one implicated in the unlawful assembly struck the blow, though it may not appear who it was. All the circumstances attending the riotous assemblage including the facts showing the violence or force employed, the threats, oaths and outcries of those participating, and their other declarations being a part of the res gestae and showing intention are relevant in evidence. It may also be shown what was done by the prosecuting witness or by members of his family or other persons not incriminated with the accused. It may be shown that the prosecuting witness or his wife fainted and was terrified by the action of the rioters, and missiles or arms used by the rioters and identified with the scene of the riot may also be introduced in evidence."

■ Tested by these rules, the evidence was sufficient to warrant the jury in returning a verdict of guilty against each of these defendants. It shows that at the time charged in the indictment these defendants and many other persons had assembled in a hall in Lafayette, owned and operated by H. A. and Ida Stofer, where beer was being sold; that a controversy arose between the defendants and said proprietors and their employees; that this resulted in a general row which

was participated in by each of the defendants and was followed by the calling in of the city marshal to quell the disturbance; that, when the city marshal entered the place, he was attacked by numerous persons, including one of the defendants, his club was taken from him and he was beaten over the head with it, and the disturbance was not quelled until the marshal had shot one of the attackers and accidentally hit another person. That each of these three defendants took part in this disturbance and encouraged acts of violence upon the part of others is clearly established by the evidence. John Nichols engaged in a fight with one of said employees and repeatedly urged Ruby Jones to start something, saying: "We will finish it." Wayne Allen was one of the parties who attacked the city marshal. Ruby Jones engaged in a fight with Mrs. Stofer and used vile, indecent and obscene language, not only toward Mrs. Stofer but against others.

This is but a mere synopsis of what occurred at that time and place and of defendants' participation in the affray, but it shows that the defendants were acting without authority of law and with the common intent and purpose, shared by each of them as well as others, to do violence to the persons of the proprietors and their employees and to destroy their property.

Section 14-602, Oregon Code 1930, provides the penalty to be imposed upon persons convicted of riot. Instead of imposing upon Ruby Jones one of the penalties there prescribed, the court followed the directions contained in section 67-2103, Oregon Code 1930, and committed her to the State Industrial School for Girls. That section provides:

"All females between the ages of eighteen and twenty-five years, convicted by any court of competent jurisdiction of petit larceny, vagrancy, habitual drunkenness, of being a prostitute, or visiting disorderly

houses or houses of prostitution, or of any other like offense, or of any other misdemeanor whatever of a like or different kind, and who in the judgment of the court, are not proper subjects for treatment in some other state institution, may be sentenced and committed to the said industrial school. Such commitment shall be for a term of not more than three years; provided, however, that such female inmate may be paroled, or released, if in the judgment of the board such action is advisable, before the sentence is fully served.''

This, the defendants claim, was error. In support of their contention, they argue that section 67-2103, which is section 3 of chapter 153, Laws 1913, violates article IV, section 20, of the state constitution, in that the subject of punishment was not expressed in the title of the act. The constitutional provision referred to provides:

''Every act shall embrace but one subject, and matters properly connected therewith, which subject shall be expressed in the title.  *  *  *''

The title to chapter 153, Laws 1913, reads as follows:

''To establish a State Industrial School for Girls; creating a State Board of Control; authorizing said board to locate a site for said institution; providing for the commitment of females between the ages of 12 and 25; authorizing said board to make rules and regulations governing release and discharge of inmates; authorizing the board to appoint a superintendent and other officers and employees and to fix the salaries thereof, and to make rules and regulations for the government of the institution; creating an advisory board; and appropriating funds for the construction of necessary buildings and for the support and maintenance of the institution.''

The contention that chapter 153, Laws 1913, violates article IV, section 20, of the state constitution, can not be sustained. The law upon this question has been so

often and so well stated by this court that any further restatement at this time would amount almost to an act of supererogation. It is only necessary to say that this constitutional provision was not intended to restrict the scope or magnitude of the single subject of a legislative act. As pointed out by Mr. Justice HARRIS in *Lovejoy v. Portland,* 95 Or. 459 (188 P. 207):

"* * * The subject of the law is the matter to which the measure relates and with which it deals: 25 R. C. L. 842. The term 'subject' is to be given a broad and extensive meaning so as to allow the legislature full scope to include in one act all matters having a logical or natural connection. The subject may be as comprehensive as the legislature chooses to make it, provided it constitutes, in the constitutional sense, a single subject and not several, for the Constitution does not contain any limitation on the comprehensiveness of the subject: State v. Shaw, 22 Or. 287, 29 P. 1028.

"The word 'subject' includes the chief thing to which the statute relates, and the words 'matters properly connected therewith' include every matter germane to and having a natural connection with the general subject of the act; or as said in State v. Shaw, 22 Or. 289, 29 P. 1029:

"'If all the provisions of the law relate directly or indirectly to the same subject, are naturally connected, and are not foreign to the subject expressed in the title, they will not be held unconstitutional'."

■ In addition to this, it may be said that the word "subject" is used in the constitution in its ordinary sense and when it says that an act shall embrace but one subject, it necessarily implies that there are numerous subjects of legislation and that only one of those subjects shall be embraced in any one act: Lewis' Sutherland Stat. Const. (2d Ed.), section 117. As pointed out by this author, this provision was not intended to restrict the scope or magnitude of a single subject of a legislative act, and that, while the subject

must be single, the provisions involved may be multifarious. As an illustration, he says that an act

"to establish the government of the state embraces but a single subject or object, yet it includes all its institutions, all its statutes. The unity of such an act, covering the multiform concerns of a common-wealth, is the congruity of all the details as parts of one 'stupendous whole', of one government. That is the grand subject of such a statute or system of laws; it is equally the object of all its varied titles of chapters and sections."

■ Obviously, therefore, the title to chapter 153, Laws 1913, which stated, among other things, that it was an act to provide for the establishment of an industrial school for girls and for their commitment therein, was sufficiently broad to authorize the legislature to enact all the provisions of section 3 to which we have referred. All these provisions were germane to the subject expressed in the title and constituted a part of the matters with which the act dealt. They all related directly to the same subject-matter and were naturally connected therewith and were not foreign to the subject expressed in the title. Consequently, since the act embraced but one subject and matters properly connected therewith, and that subject was expressed in the title, neither the act itself nor section 3 thereof was unconstitutional.

■ Upon the trial, the defendants moved that Carl Allen and E. M. Maxwell, who had been jointly indicted with them and who had not been acquitted or convicted and were not on trial at the time, be dismissed from the indictment so that they could be used as witnesses for the defendants. The court overruled the motion and this ruling is assigned as error.

Section 13-926, Oregon Code 1930, provides:

"When two or more persons are charged in the same indictment, and the court is of opinion that, in regard

to a particular defendant, there is not sufficient evidence to put him on his defense, it must, if requested by another defendant then on trial, order him to be discharged from the indictment, before the evidence is closed, that he may be a witness for his codefendant."

In *State v. White,* 48 Or. 416 (87 P. 137), it was held that a motion, under this section, to discharge a codefendant "was a matter, based upon the sufficiency of evidence, [and] within the discretion of the court". Again, in *State v. Goff,* 71 Or. 352 (142 P. 564), and *State v. Chapin,* 74 Or. 346 (144 P. 1187), it was held that, where defendants are jointly indicted and have been granted separate trials, it is not error for the court to deny the motion to dismiss one of the defendants from the indictment so that he can become a witness for the defendant. The latest ruling of this court upon this question will be found in *State v. Hale,* 141 Or. 332 (18 P. (2d) 219), where Mr. Justice CAMPBELL, speaking for the court, said:

"The court, having exercised its discretion in having appellant tried separately, the co-defendant, not having been acquitted or convicted and not on trial, would not be a competent witness."

■ The defendants contend that the court erred in refusing to grant a motion made by the defendants for a mistrial because of a statement made by the district attorney in his final argument to the jury. The record shows that Mr. Nott, the district attorney, in his argument to the jury said:

"* * * Isn't it passing strange that although these people have lived so long in this county, that not a single witness has been produced—."

At this point and before he had said anything further, the following occurred:

"MR. KLIKS: (Interrupting) Your Honor, I have called twice before in the trials to Mr. Nott's statement

that he has no business to comment on whether or not
—I have in two prior trials commented on the fact that
Mr. Nott had no business to comment as to whether a
defendant brought character witnesses, or not. He has
done so now, after Judge Walker has on two previous
occasions sustained that very objection, and for that
error, deliberate, because he has done it twice before in
this court room, I move now that the jury be discharged
and these defendants be discharged.

"The Court: What do you think about the right of
comment upon the failure to produce character
witnesses?

"Mr. Nott: It may be—I was under the impression
that it was, Your Honor.

"Mr. Kliks: Your Honor, he knows better. It is
twice before that that ruling has been against him.

"Mr. Nott: Especially in view of the fact that
counsel in his argument dwelt extensively upon the
long residence of the defendants and that they were
local citizens.

"The Court: Well, I am not really advised upon
the question. I think probably the objection will be
sustained to it. I will deny the motion and allow an
exception."

It is impossible to say from this record what Mr.
Nott, the district attorney, had in mind and was about
to say when he was interrupted, and whether he in-
tended to refer to the absence of character witnesses
or not the record does not disclose. It may have been
a case where a very zealous attorney anticipated that
something improper might be said. Whether so or not,
nothing improper was said by Mr. Nott and, if he in-
tended to say something which was not proper, he was
effectively prevented from doing so by the interruption
of defendants' counsel.

■ According to the evidence, Rainey, the city mar-
shal, upon entering the beer hall, said to some of
those present at the time: "Boys, you are under ar-

rest". As soon as this was said and before any one had been placed under restraint or had submitted to the officer's custody, or anything further had been done by the officer, he was attacked. Based upon these circumstances alone, certain instructions were requested by the defendants as to the power of an officer to make an arrest without a warrant for a misdemeanor not committed or attempted in his presence, and also as to the right of a person to resist an officer who is attempting to make an unlawful arrest.

There was no contention that the defendants, or either of them, were acting in self-defense or that the officer did any act or made any declaration except as above stated. Under the statute, an arrest is the taking of a person into custody that he may be held to answer for a crime and is made by an actual restraint of the person of the defendant, or by his submission to the custody of the officer: Sections 13-2101 and 13-2105, Oregon Code 1930. The fact, as it appears from the evidence, that the attempted arrest was not completed by the taking of the defendants into the actual custody of the officer, or their submission to his custody, did not authorize the defendants, or either of them, to make or participate in an unlawful assault upon the officer, whether the attempted arrest was lawful or unlawful, nor justify them in doing so, and, hence instructions such as those requested, and based upon the assumption that the officer was acting without authority and that the defendants had the right, under the facts proved, to resist the officer by force and violence, were properly refused.

Other questions have been presented upon this appeal, all of which have been carefully considered and found to be without merit.

Finding no error, the judgment is affirmed.

CAMPBELL, C. J., and BEAN and BAILEY, JJ., concur.