## SALEM MFG. CO. v. FIRST AMERICAN FIRE INS. CO. OF NEW YORK.

### No. 9372.

Circuit Court of Appeals, Ninth Circuit.

May 9, 1940.

Stephen W. Matthieu, of Portland, Or., and Rhoten & Rhoten, of Salem, Or., for appellant.

H. A. Thornton and Evans M. Taylor, both of San Francisco, Cal., and A. L. Veazie and J. C. Veazie, both of Portland, Or., for appellee.

Before GARRECHT, HANEY, and HEALY, Circuit Judges.

GARRECHT, Circuit Judge.

This action was instituted to recover the sum of $20,000 and interest under the terms of what is commonly known as a riot and civil commotion insurance policy.

During all the time herein referred to, the appellant was a corporation, organized and existing under and by virtue of the laws of the State of Oregon. Prior to February 26, 1938, the name of said corporation was Salem Box & Manufacturing Company, Inc., but on said day the name was changed to Salem Manufacturing Company, and it may hereinafter be referred to as the box company. The appellee, First American Fire Insurance Company, is a corporation, organized and existing under the laws of the State of New York, and by virtue of the laws of the State of Oregon is authorized to do an insurance business in that state.

This action was instituted in the Circuit Court of the State of Oregon for Polk County and upon petition of appellee was thereafter removed to the United States District Court for the District of Oregon. The complaint alleged that on July 27, 1937, in consideration of a premium paid, the insurance company executed and delivered to the box company a policy of insurance which insured it "Against All Direct Loss or Damage Caused by Any of the Following: "(1) Riot; (2) Riot Attending a Strike; * * *" Other pertinent provisions of the policy were:

"If loss occur the insured shall give immediate notice in writing to this Company * * *; and within sixty days after the loss, unless such time is extended in writing by this Company shall render a statement to this Company, signed and sworn to by said insured, * * *. [Here follow the details to be furnished, which, we believe, do not require consideration.]

"No suit or action on this policy, for the recovery of any claim, shall be sustainable in any court of law or equity unless all the requirements of this policy shall have been complied with, nor unless commenced within twelve months next after the loss; * * *"

It was further alleged that on or before November 20, 1937 (while the policy was in effect), a riot participated in by the persons named in the complaint and others, occurred at or near the box factory and that as a part of said riot and as a result thereof the insured property was completely destroyed by fire; that the property so destroyed was of a value in excess of the insurance, and that by reason of the riot appellant sustained loss totaling $20,000.

Appellant alleged in an amended complaint its full compliance with the terms of the policy (this having been denied by the answer). Appellee's answer pleaded certain provisions of the insurance policy, one of which was that appellant was required to furnish proof of loss within sixty days after the fire occurred, and the answer averred that although the fire occurred on November 20, 1937, appellant furnished no proof of loss until August 11, 1938. In its amended complaint appellant admits that it did not present proof of loss until about said date but avers that it did not discover that the fire was the direct and proximate cause of the riot until during the month of July, 1938. This allegation was controverted by appellee. The answer also denied there was any riot which was the proximate cause of the fire or any riot at all. Other affirmative defenses were pleaded in the answer to the effect that after the destruction of the property, the policy was surrendered and canceled; that appellant had collected other insurance for the loss; that there was no opportunity given appellee for appraisal of the loss; that it had been deprived of its right to subrogation; that there had been an election of remedies; and, finally, there was a plea of estoppel.

Affirmative matters alleged in the answer are not pertinent on this appeal as the

appellee was awarded a directed verdict at the conclusion of appellant's evidence.

The following is a summary of the facts of the case based upon the evidence presented by appellant. During the year 1937 appellant had become involved in a controversy with a labor union which was attempting to unionize the box factory at Salem, Oregon. Beginning about July 23, 1937, a picket was placed near the box factory plant. About the second day some of appellant's employees went out and ordered the pickets to leave, which they did for that day. The next day they returned with a bodyguard of about twenty men, who stationed themselves across the road from the plant. Soon after their arrival the employees and bodyguard began throwing at one another, the employees using rotten eggs, the bodyguard using rocks, some of which hit the box factory building. On the first day the pickets stopped a Japanese gardener and interfered with his effort to back his truck into the plant; other customers were stopped and warned against coming into the box factory. After the first encounter only a few of the bodyguard accompanied the picket. He usually arrived at eight o'clock, when work started, and quit at five, when the factory closed for the evening. About July 31, 1937, the appellant procured a court injunction, and there was no picketing through August and until September 10, when the court dissolved the injunction. On that day the picket returned, but he had no bodyguard until after about October 1, when the employees of appellant went out and tore his banner off of him; on the next day he returned with his bodyguard.

The picket at no time disturbed or interfered with appellant's customers, but the bodyguard "would holler at the customers and tell them to stay out." They would stop the trucks when they were backing in, and warn against going into the plant. Off and on there was throwing between the plant employees and the picket guard.

Concerning the strike situation appellant's president and manager, among other things, testified that on different occasions there was some trouble between his employees and the picket guards. He said, "I didn't pay so much attention to it, but the boys somehow didn't like the picket there."

"Q. Well, did the picket have some help at different times? A. Oh, he had help pretty near all the time.

"Q. And what do you mean by help? A. I think he had protection.
* * *

"A. When the pickets were first placed there were two pickets there, one for the Salem Box Company and one for the Beutler-Quistad Lumber Company. The one for the Salem Box Company was outside of the city limits and the one for the Beutler-Quistad was in the city limits. There was an ordinance against carrying a banner without a permit and this picket was arrested, * * *."

After the picket was arrested about half a dozen of the bodyguard came over that afternoon.

"Q. And then what happened?

"A. And there was a lot of milling around, and some of our boys, some of the boys in the shop, got in arms and quite a number of them got clubs ready and I discovered it and I told them to lay off of the clubs, 'We don't want any trouble over here.' Later on we had trouble anyway, you just couldn't stop it, because the men were never approached by the organizer. * * *

"Q. All right. You say there was clubs; did you see those clubs? A. Yes, I saw those clubs.

"Q. Were you present at the time there was any throwing of rocks back and forth? A. Well, I didn't see it at first and then somebody called my attention to it and I looked out and they were throwing rotten eggs from our side, from the factory side, and rocks from the other side, and I went and stopped it. I told the boys to lay off of it because we didn't want to get anybody hurt."

Another witness for appellant, testifying concerning the trouble between the representatives of the labor union and the employees of appellant, said, "Well, the picket had been mobbed and his banner torn off and he came back to the Labor Temple and reported * * *"

A. N. Banks was the business agent of the Teamsters' Union in Salem. Rosser was secretary of the Joint Council of the State of Oregon and Southwestern Washington, and the superior officer of the council in the district. Banks at numerous times reported the activities going on about the box factory and the trouble there about

the picket being mobbed and his banner torn off. Thereupon Rosser decided that the method to be used for taking care of the trouble was to burn the box factory. The events leading up to and attending the setting of the fire were testified to by appellant's witnesses, Banks, Carson, and Newland. At the time of the trial all of these men were prisoners in the Oregon State penitentiary, serving sentences for arson for having been implicated in setting fire to appellant's factory.

On November 19, 1937, the day preceding the fire, the picket and the bodyguard were at their accustomed places near the plant. The bodyguard left early in the day, and the picket left about two-thirty or three o'clock in the afternoon.

About noon that day Newland and Carson, accompanied by one Moore, who had just arrived from California, came to Banks' office. After having had breakfast they all got into Newland's automobile and drove past the box factory. They were shown a building in the back of the factory where chips were kept. It was agreed that Moore, Carson, and Newland were to come back that night, about midnight, and burn the factory. Newland testified that while discussing the arrangements for the burning, there was some talk as to the possibility of a watchman being on duty at the plant; that Moore said "if there was a watchman there, why, just knock him out and leave him lay." However, Banks told them that there was no watchman at the plant after about ten or eleven o'clock at night, but in case that he was there, they were to forget the job, and if it did not look right, for them to let it go.

The remarks of Moore regarding possible violence to the watchman is referred to at several places in the testimony and is emphasized in appellant's brief as basis for the contention that the burning of the box factory was the culminating disaster of the alleged riot. Concerning the conversation appellant's witness testified:

"Q. Now Cecil Moore said that he was willing to go in and touch that off himself, didn't he? A. Yes.

"Q. And you went with him to prevent any violence in case you encountered anybody; isn't that right? A. Yes, sir.

"The Court: Was one reason for that because Banks said he didn't want any violence? A. I don't remember if there was any discussion about that with Banks.

"The Court: Your recollection is that was just your idea and Carson's idea? A. Yes, sir.

"The Court: That you two didn't want any violence? A. That is right; yes, sir.

"Q. And during the time that you were in or around that factory you saw nobody that night, did you? A. No, sir.

"Q. That is, except Moore and Carson? A. Yes, sir.

"Q. And that is true, taking the time a little before you reached the factory until after you left there, you saw nobody except the other two men; is that right? A. Yes, sir."

The testimony shows that the burning of the factory was to be effected by Moore, Newland, and Carson. Moore had volunteered to set fire to it himself, but on account of the remark made by him relative to knocking out any watchman that might appear on the scene, Newland and Carson were anxious to avoid the possibility of any violence being done the watchman, if he should be about the premises. So instead of letting Moore do the job alone, it was agreed between Carson and Newland that the latter was to be with Moore and that the fire would not be set until about one o'clock in the morning. About that time Carson drove the car to a point in the roadway in front of the plant; Moore and Newland got out, took with them a gallon of gasoline and a book of matches. Neither had any weapons. They sprinkled the gasoline on some trash and old lumber at the rear of the box factory, lighted it, and then ran back and got into the car, which was driven away as fast as possible.

### As to Proof of Loss.

It is admitted that the loss occurred on November 20, 1937, and that the proofs of loss were not made until August 11, 1938. Appellant pleads as an excuse for the delay that "The fact that said destruction was the direct and proximate result of a riot was not discovered by or known to plaintiff until during the month of July, 1938."

Appellant is charged with the knowledge of its manager and agents. The manager, Mr. Friesen, and Mr. Crabb, the bookkeeper, testified at length on conditions existing in and about the plant during the time the strike was on up to the day of the fire. Thereafter they kept informed on events pertaining to the fire.

Mr. Crabb knew of the picketing of the mill; the rocks and rotten egg encounter; the truck stopping episodes and other difficulties narrated above. He knew that Newland, Carson, and Moore on January 31, 1938, were arrested for burning the factory, that they all three pleaded guilty. He knew that Banks was arrested February 8, 1938, pleaded guilty February 16, 1938, and was sentenced April 24, 1938.

Mr. Friesen, the manager, knew of the conflict between the boys in the shop and the picket and his bodyguard, the throwing of eggs from the factory side and rocks from the other side; that a number of the shop boys got clubs ready to beat up the opposition and that he made them lay off because he did not want anybody hurt. He was advised of the fire immediately after it started to burn. Proof of loss was presented to other insurance companies, in which was set forth the following statement: "A fire loss occurred on the 20th day of November, 1937, about the hour of 1:30 o'clock A. M., which upon the best knowledge and belief of assured originated incendiary—person or persons unknown." The instrument was signed by Mr. Friesen and sworn to on the 23d day of November, 1937. On his examination he said he did not know his statement was in the proof. However, he admitted that he did know during the first part of the month of February, 1938, that the fire had been set and that he had read The Oregon Statesman, of February 9, 1938, which contained pictures of Banks, Carson, Newland, and Moore, and the news item that these men had been arrested charged with burning appellant's box factory. This item, among other matters, reported that Mr. Friesen had said "he had been convinced at all times that it was incendiary." Friesen admitted that about February 9th or 10th, 1938, he had talked to Banks at the Polk County Court House relative to the fire, that Banks broke down and cried and told him he was sorry about the fire.

C. M. Lindberg, a witness for appellant, testified that in the latter part of April, 1938, he was employed by appellant to make an appraisal of the property that had been destroyed by the fire, to be used in a suit the appellant contemplated bringing against the unions on account of the destruction of the plant. Mr. Friesen employed him.

At the conclusion of plaintiff's evidence defendant moved for a directed vedict on the following grounds:

"First, the plaintiff has failed to prove that the loss and damage caused by the fire alleged in the complaint was caused by or arose out of a riot.

"Second, the plaintiff has failed to prove that the loss and damage alleged in the complaint was covered by the policy of insurance issued by the defendant.

"Third, the plaintiff has failed to comply with policy conditions relative to filing proofs of loss.

"Fourth, the plaintiff has failed to prove compliance with the policy conditions as alleged in plaintiff's complaint.

"Fifth, that it affirmatively appears that the loss and damage alleged in said complaint was covered by policies of fire insurance, whereas in and by the policy of insurance issued by the defendant it was and is provided that this company shall not be liable for loss or damage covered under any fire or other kind of insurance contracts."

After hearing the argument upon the motion the court directed the jury to return a verdict for the defendant. A verdict as directed was received and entered, and thereupon judgment was rendered for appellee from which appellant appeals to this court.

In passing on the motion for directed verdict the court below stated to the jury: "This case involves a question as to whether a riot occurred under the Oregon statute, which requires the use of force or violence by three or more persons acting together. In my opinion there has been no substantial credible evidence offered indicating that force or violence was used, and, therefore, it is my duty to request and direct you to return a verdict for the defendant * * *" The appellant assigns this action of the trial court as the sole error presented on this appeal. "It is the contention of the appellant that 'force and violence' within the meaning of the Oregon statute abundantly appear by the evidence."

In opening its argument appellant says in its brief: "As stated by the trial court in directing the verdict, this question evolves around the Oregon statute which defines the term 'riot.' It has been assumed by all of the parties and the trial court as well, and we think properly so, that the Oregon statutory definition of riot should be read in connection with terms of the policy. The policy of insurance insures against all direct loss or damage

caused by riot, but no attempt is made in the policy to define the term 'riot.'"

Section 14-601, Chapter VI, Title 14, Oregon Annotated Code, undertakes to define riot and unlawful assembly in the same section—the first sentence applies to riot; the second sentence, immediately following, refers to unlawful assembly. For purposes of clarity we here separate the two sentences, but in the original text both are parts of the same paragraph:

"Definition of riot and unlawful assembly.—[1st sentence] *Any use of force or violence, * * * if accompanied by immediate power of execution, by three or more persons acting together, and without authority of law, is riot.* [Emphasis supplied.]

"[2d sentence] Whenever three or more persons assemble with intent, or with means and preparation to do an unlawful act, which would be riot if actually committed, but do not act towards the commission thereof, or whenever such persons assemble without authority of law, and in such manner as is adapted to disturb the public peace or excite public alarm, or disguised in a manner adapted to prevent them from being identified, such assembly is an unlawful assembly."

It conclusively appears that the plan to burn the box factory of appellant was to be accomplished with great secrecy and without causing any disturbance. The hour of one o'clock in the morning was selected because it was known that the watchman, who usually stayed on duty until ten or eleven o'clock at night, would have gone home. It was understood that if a watchman was found on the premises, or some other interruption occurred, that the purpose to burn the buildings would be deferred to a more favorable time. Neither Newland or Moore, who set the fire, was armed in any way. They accomplished their purpose quietly, without any disturbance whatever. They saw or heard no one, and there is no evidence that they were seen or heard by anyone. It is worthy of note that appellant pleads that it did not discover that a riot had occurred until about a year after the event. The circumstances attending the setting of this fire did not constitute a riot according to the common understanding of the word or according to the definition of the common law.

"* * * In the common-law authorities there is no substantial disagreement concerning the definition of a riot. In 4 Blackstone (Chitty's Ed.) p. 147, we find the following: '"A riot" is where three or more actually do an unlawful act of violence, either with or without a common cause or quarrel, as, if they beat a man, or hunt and kill game in another's park, chase, warren, or liberty, or do any other unlawful act with force and violence, or even do a lawful act, as removing a nuisance, in a violent and tumultuous manner.' In 1 Russell on Crimes, p. 265, an old English work of high repute, the author states: 'A "riot" is described to be a tumultuous disturbance of the peace by three persons or more, assembling together of their own authority, with an intent mutually to assist one another against any who shall oppose them in the execution of some enterprise of a private nature, and afterwards actually executing the same in a violent and turbulent manner, to the terror of the people, whether the act intended were of itself lawful or unlawful. * * * It seems to be agreed that the injury or grievance complained of and intended to be revenged or remedied by a riotous assembly must relate to some private quarrel only, * * * or such like matters relating to the interests or dispute of particular persons in no way concerning the public. It seems to be clearly agreed that in every riot there must be some such circumstance, either of actual force or violence, or at least of an apparent tendency thereto, as are naturally apt to strike a terror into the people. * * * But it is not necessary, in order to constitute this crime, that personal violence should have been committed. * * * But the violence and tumult must be in some way premeditated; for if a number of persons being met together at a fair, market, or any other lawful or innocent occasion happen on a sudden quarrel to fall together by the ears, it seems to be agreed that they are not guilty of a riot, but only of a sudden affray. * * * But, if there be any predetermined purpose of acting with violence and tumult, the conduct of the parties may be deemed riotous.' This definition is also found in 1 Hawkins, Pleas of the Crown, p. 513. Webster defines a riot to be 'the tumultuous disturbance of the public peace by an unlawful assembly of three or more persons in the execution of some private object.' And Bouvier in his Law Dictionary as 'a tumultuous disturbance of the peace by three persons or more, assembling together of their own authority, with an

intent mutually to assist each other against any who shall oppose them in the execution of some enterprise of a private nature, and afterwards actually executing the same in a violent and turbulent manner, to the terror of the people, whether the act intended were of itself lawful or unlawful.' The common-law definition of a riot is generally approved by modern text-writers on the subject of criminal law. Thus Bishop in his work on Criminal Law (volume 2, §§ 1143, 1149), although he makes slight criticism of the definition laid down by Russell on Crimes, says: A 'riot is such disorderly conduct in three or more assembled persons, actually accomplishing an object, as is calculated to terrify others. * * * The act of the rioters need not be such as it would be unlawful for one to perform. Whether in this sense lawful or unlawful, if it is done by three or more in a turbulent manner, calculated to excite terror, it is a riot.' Wharton in his work on Criminal Law (volume 2, §§ 1537 [1539], 1544), defines a riot as 'a tumultuous disturbance of the public peace by an unlawful assembly of three or more persons in the execution of some private object. * * * It must be also shown in riot that the assembling was accompanied with some such circumstances, either of actual force or violence, or at least having an apparent tendency thereto, as were calculated to inspire people with terror; such as being armed, making threatening speeches, turbulent gestures, or the like. * * * To constitute a riot it is not necessary that there should be actual fright to the public generally. It is enough if the action of the parties implicated be so violent and tumultuous as to be likely to cause fright, and if individuals are frightened.' These general definitions are approved in Aron v. Wausau, 98 Wis. 592, 74 N.W. 354, 40 L.R.A. 733; State v. Stalcup, 23 N.C. 30 [1 Ired.Law 30], 35 Am.Dec. 732; Lycoming F. Ins. Co. v. Schwenk, 95 Pa. 89, 40 Am.Rep. 629; Dupin v. Mutual Ins. Co., 5 La.Ann. 482; Com. v. Gibney, 2 Allen (Mass.) 150; State v. Snow, 18 Me. 346; State v. Hughes, 72 N.C. [25], 27. It will thus be seen that the modern definition of a riot is in harmony with and follows the common-law definition, and that the legal meaning of the word corresponds with the meaning given to it in ordinary usage. It has no technical import as distinguished from its signification when used in the everyday affairs of life. If we look to either Blackstone or Webster, we have the same result."

The above quotations are taken from the opinion in Spring Garden Ins. Co. v. Imperial Tobacco Co., 132 Ky. 7, 116 S.W. 234, 235, 20 L.R.A.,N.S., 277, 279, 280, 136 Am.St.Rep. 164, cited in appellant's brief.

To sustain its claim that the burning of the factory in the case at bar was the culmination of a riot and within the definition of the Oregon statute appellant cites and comments on a number of criminal cases decided by Oregon courts: State v. Mizis, 48 Or. 165, 85 P. 611, 86 P. 361; State v. Seeley, 51 Or. 131, 94 P. 37; and State v. Allen, 152 Or. 422, 53 P.2d 1054. It would require too much space to discuss these cases at length; it is sufficient to point out that in each of them the facts comported with the common understanding of a riot as expressed in the citations of authority heretofore quoted. The conduct of the participants in each case was boisterous and disorderly. They all involved disturbances connected with force and violence and the use of firearms, always resulted in someone being hurt, and in every case, with a single exception, one or more persons were killed.

Appellant also cites as supporting its contention a number of insurance cases, which required the determination of what constituted a riot within the terms of the policy of insurance: Lycoming Fire Insurance Co. v. Schwenk, 40 Am.Rep. 629, 95 Pa. 89; Spring Garden Insurance Co. v. Imperial Tobacco Company, 132 Ky. 7, 116 S.W. 234, 20 L.R.A.,N.S., 277, 136 Am.St.Rep. 164; Luckett-Wake Tobacco Co. v. Globe & Rutgers Fire Insurance Co., C.C., 171 F. 147; Brous v. Imperial Assurance Co., 130 Misc. 450, 224 N.Y.S. 136; Insurance Co. of North America v. Rosenberg, 2 Cir., 25 F.2d 635. In these cases the courts held that the facts showed that the fire was the work of rioters. But, just as in the criminal cases heretofore noted, in each case there was putting in fear by threats to do bodily harm or the exhibition of weapons or actual discharge of firearms; in fact there was such display of force that people were terrified. Of course such unlawful acts constituted riot.

■ Appellant contends that the commission of the crime of arson, the effort required to carry gasoline to the box factory, pouring it upon the inflammable debris, and striking and applying the match constituted such acts of force and violence

as to render the action of the trial court erroneous. Such a construction would make practically every crime committed by three or more persons a riot. If three unarmed men acting together at night entered a field through a gate and without noise or disturbance carry away three sacks of grain, could it be said that they had been engaged in a riot? The words used in phrasing the statute preclude any such construction. It says: "Any use of force or violence, or any threat to use force or violence, if accompanied by immediate power of execution, by three or more persons acting together, * * * ." This cannot mean the force used to light a match.

In Walter v. Northern Ins. Co., 370 Ill. 283, 18 N.E.2d 906, 121 A.L.R. 244, damage was done to an unoccupied house by persons who entered it by stealth, without disturbing anyone; it was held not to be within the coverage of an insurance policy against damage by riot, and it was further held that a statute defining criminal "riot" and penalizing those engaging therein would not be construed as changing the common law beyond what is expressed by the words of the statute. In that connection the court said (370 Ill. 283, 18 N. E.2d 908, 121 A.L.R. 248): "The question comes, then, on the construction of the terms 'force' or 'violence.' Do they mean merely the manual force necessary to accomplish the act, or do they mean something more? There is no doubt that under the common law 'force or violence' meant a concerted intent of the perpetrators to mutually assist one another against all who should oppose them in the doing of an unlawful act. 3 Greenleaf on Evidence, 16th ed., sec. 216. Thus the definition of riot, under the common law, meant more than the mere force necessary to do the act; it meant a defiance of constituted authority or of the rights of the person injured, or his effort to protect such rights. The terms 'force' and 'violence,' as applied to offenses of this character, are, according to such standard lexicographers as Webster and Bouvier, synonymous."

The force contemplated by the act is the united force of three or more individuals acting in concert with the increased capacity to overcome resistance, and significantly the statute makes the threat to use force or violence equally punishable. Clearly, then, the force and violence forbidden was not merely muscular exertion, but of a kind with which a

person could be threatened. The threat contemplated by the law was not one made against some inanimate object, but against an individual. In this sense there can be no threat without a person to be threatened. "Threat" is defined in Funk & Wagnall's New Standard Dictionary as:

"1. A declaration of an intention to inflict pain, injury, or punishment; a menace.

"2. Law. Any menace of bodily hurt through fear of which a man's business is interrupted; any menace of destruction or injury to life, reputation, or property, *with a view to restrain a person's freedom of action.* [Emphasis supplied]

The Supreme Court of Oregon has held that words used in statutory definitions are to be construed in accordance with common understanding.

"In construing penal statutes, the legislative intent is in most cases to be found by giving to the words the meaning in which they are used in ordinary speech." Kirk v. Farmers' Union Grain Agency, 103 Or. 43, 202 P. 731, 732.

The case of International Wire Works v. Hanover Fire Ins. Co., 230 Wis. 72, 283 N.W. 292, was an action to recover on a riot insurance policy. Plaintiff owned a manufacturing plant. On the night in question the janitor locked the plant and went home. On his return in the morning he found that someone had entered during the night and had done very extensive damage to the machinery and to cases of wire cloth which were ready for shipment. The guilty persons apparently used a pick-axe, or some such instrument, and an electric drill. While the wording of the statute against riot was not exactly like the Oregon statute, it was generally similar. In sustaining the action of the trial court in dismissing the action the Supreme Court said (230 Wis. 72, 283 N.W. 293):

"The generally understood meaning of the word 'riot' is an assembly of individuals who commit a lawful or unlawful act in a violent or tumultuous manner, to the terror or disturbance of others. * * *

"The trial court correctly ruled that there was no material distinction between the common meaning of the word 'riot' and the definition contained in the statutes. The court was also correct when it said, 'The essence of the offense is violence and tumult. There has been a total absence of any proof which would establish riotous

destruction of property, and the court must therefore hold for the defendant.'

"Taken together, the definition of riot in sec. 347.02 and the imposition of liability in sec. 66.07 leave no room for doubt that the generally accepted definition of riot obtains in this state and that an element which must be included is the terror or disturbance of persons who are not participating in the violent or tumultuous acts. The parties to the insurance contracts upon which the present action is brought contemplated something more than violent acts done by three or more persons in stealth without the knowledge of others who might resist their acts or summon the armed force of the city. Even though there is terror or disturbance at the time that the damage is discovered, a crime committed secretly away from the public view is not a riot. No riot exists in the absence of publicity at the time of the violent or tumultuous acts."

In Kirshenbaum v. Massachussets Bonding & Ins. Co., 107 Neb. 368, 372, 186 N. W. 325, 326, it is said: "The words 'riot or civil commotion' as used in the policy in suit will be given their popular or usual meaning, and be held to imply the wild or irregular action or tumultuous conduct on the part of three or more persons assembled together for the common purpose of doing an unlawful act."

No decisions from the Courts of the State of Oregon construing this statute as it may relate to insurance contracts have been brought to our attention; so we follow here the generally accepted rule. According to the weight of authority the term "riot" as used in a policy of insurance will be given its usual and ordinary meaning. In such cases it will not be presumed that a criminal statute defining "riot" has changed the common-law meaning or definition of that term beyond what is expressly declared therein or that any innovation is intended further than is specifically expressed or clearly to be implied.

Since the views heretofore expressed are decisive of this case, it is not necessary to discuss appellant's failure to furnish proof of loss within the time required by the terms of the policy of insurance.

Affirmed.

HANEY, Circuit Judge, concurs in the result.