### PAPE et al. v. HOME INS. CO.
### No. 98.

Circuit Court of Appeals, Second Circuit.

Nov. 18, 1943.

Frank A. Bull, of New York City (Duncan & Mount, of New York City, on the brief), for appellant.

Gregory S. Rivkins, of New York City (Hill, Rivkins & Middleton and Thomas W. Geary, all of New York City, on the brief), for appellees.

Before L. HAND, CLARK, and FRANK, Circuit Judges.

CLARK, Circuit Judge.

The issues in this interesting case can be understood by an abbreviated statement of the stipulated facts, reference being had to the complete opinion below, 48 F.Supp. 754, for further details. This suit is upon an insurance policy for the loss of cotton in Barcelona, Spain, in 1936, during the Spanish Civil War. The policy is one of fire insurance upon cotton, with coverage extended, inter alia, to loss or damage in Spain caused by "Riot," "Civil War," "Civil Commotion," or "Military or Usurped Power"—"confiscation or authorized destruction by duly constituted governmental or civil authorities" being, however, excepted. The policy expired on October 18, 1936. In July, 1936, civil war broke out in Spain, and throughout the country there were chaotic conditions, with murder and robbery committed on the streets and seizure of persons and property, so that the police and government officials were unable to preserve order "and even uncertain of their ability to protect themselves." Barcelona is the capital and principal city of Catalonia, which during the time here involved was "a duly constituted autonomous government, dependent on, and co-operating with, the Spanish Republican Government." On October 6, 1936, a committee duly appointed by the National Confederation of Labor at Barcelona, "a body without official standing," notified various public warehouses and others that "in view of the fact that it is imperative for factories to have necessary cotton to prevent their complete stoppage and in order to avoid a conflict which might have very serious consequences even affecting public order" it was seizing all the stocks of cotton existing in town for delivery "to the Industrial Cotton Committee for its distribution, as the latter is an organization that deserves the maximum confidence." While it is stipulated that the Cotton Committee was "a semi-official duly constituted body depending from the Spanish

government at Madrid," the court below stated with some reason that if the case turned upon a finding of its official character "there would be such a deficiency of proof as to cause a derail of decision for inability to arrive at destination." 48 F. Supp. at page 755. The Labor Committee also posted notices on the warehouses that all stocks of cotton therein stored "are taken over" by it.

On October 8, a United States consul conferred with an official of the Catalan government, who disclaimed knowledge of these acts of the Labor Committee and stated that they ran counter to the plans of his department. Nevertheless, after further representations by the United States Consul General at Barcelona and on or before October 17, 1936, the Catalan government asserted by one of its officials that, "with the object of tranquilizing you and the parties concerned," it "takes upon itself the care of North American interests and will in due time determine definitely the reimbursement of the amount represented by the said attachments."

Later, after the policy had expired, the Catalan government distributed the cotton to the Barcelona factories. Meanwhile plaintiffs, with defendant's knowledge and consent, negotiated with this government for a reimbursement for the cotton. On December 15 and 16, 1936, the government made a settlement with plaintiffs, to which defendant consented, with the agreement that it should not prejudice the parties herein as to their respective rights. By this settlement the government paid plaintiffs an amount in Spanish money which eventually yielded a sum in American money equal to about 60 per cent of the value of the cotton. The judgment below gives plaintiffs the remaining value.

Defendant's first claim is that there was no breach of the policy during its term. Specifically it says that plaintiffs' possession of the cotton was not actually disturbed until either (1) the Catalan government assumed authority for the Labor Committee's acts, and hence brought them within the policy exception, or (2) the cotton was distributed to the factories after the policy had expired. The district court held, however, that the policy was breached on October 6 by the acts of the Labor Committee, and that no events occurring thereafter operated to wipe out that breach. We think that this was a correct conclusion from the facts agreed upon by the parties.

■ While the stipulation of facts is somewhat meager as to the effect of the Labor Committee's activities, we must draw such deductions from the conceded circumstances as seem just and reasonable. It is true that the cotton was not physically moved from its situs until a later time. But the Labor Committee clearly intended to do, and thought that it had done, just what it says, namely, "seize" or "take over" the cotton. That it had done so seems to have been accepted by all parties on the spot, including the American consular representatives and the Catalan government, which refers to the acts as "attachments." A natural conclusion is, therefore, that this committee took control of the warehouses with sufficient display of strength so that every one acquiesced in its power. A testing of that strength by resistance, even to the point of possible bloodshed in view of the existing conditions in Spain, was surely not necessary. We think, therefore, that a loss for riot, civil commotion, or usurped power was shown. Walter v. Northern Ins. Co. of New York, 370 Ill. 283, 18 N.E.2d 906, 121 A.L.R. 244; Salem Mfg. Co. v. First American Fire Ins. Co. of New York, 9 Cir., 111 F.2d 797; Insurance Co. of North America v. Rosenberg, 2 Cir., 25 F.2d 635; Kirshenbaum v. Massachusetts Bonding & Ins. Co., 107 Neb. 368, 186 N.W. 325; Hartford Fire Ins. Co., Hartford, Conn., v. War Eagle Coal Co., 4 Cir., 295 F. 663, 665. The cases relied upon by defendant where the German invasion of the Lowlands during the First World War was held not to be a breach of certain insurance policies are not in point, since they involved not a deprivation of possession of goods, but merely a denial of access to the places where they were stored during the state of war. Moore v. Evans, [1918] A.C. 185; Mitsui v. Mumford, [1915] 2 K.B. 27; Campbell & Phillipps, Ltd. v. Denman, 21 Com.Cas. 357. And the non-official character of the Labor Committee makes inapplicable the exception for confiscation by duly constituted governmental authorities. Cf. White, Child & Beney, Ltd. v. Eagle, Star & British Dominions Ins. Co., 38 T. L.R. 616, reversing 38 T.L.R. 367.

■ If, therefore, the breach was complete on October 6, no ratification by the Catalan government later could take away its force. An insurance policy is fundamentally an agreement to pay a sum on the happening of an event; when that event has definitely taken place in accordance with the terms of the contract, the payment becomes due. True, the insured under ordinary contract principles must take such steps as are reasonable to keep the damage as low as possible; and that, indeed, was a particular specification of this policy in a clause which required the insured to do all acts and things necessary or reasonably required by the insurer for the purpose of obtaining relief or indemnity from other parties. Here the later steps taken by plaintiffs, with the knowledge, consent, and approval of defendant and subject to the agreement against prejudice of the rights of either party, constituted proper steps to reduce the loss, rather than acts which blotted out the breach once established. Such, indeed, seems to be the general view of insurance law, subject, of course, to the special provisions or conditions of particular contracts. See O'Connor v. Maryland Motor Car Ins. Co., 287 Ill. 204, 122 N.E. 489, 3 A.L.R. 787; Kleinman v. Globe & Rutgers Fire Ins. Co., 111 N.J.L. 374, 168 A. 648; Cancilla v. Firemen's Fund Ins. Co. of San Francisco, Cal., 277 Pa. 223, 120 A. 824; Holmes v. Payne, [1930] 2 K.B. 301; Roura & Forgas v. Townend, [1919] 1 K. B. 189; Polurrian S. S. Co. v. Young, [1915] 1 K.B. 922; Goldberg v. Employers Liability Assur. Co., 66 D.L.R. 716; Lee v. Boardman, 3 Mass. 238, 3 Am.Dec. 134; Bradlie v. Maryland Ins. Co., 37 U.S. 378, 12 Pet. 378, 398, 9 L.Ed. 1123, 1132. Hence the breach would not be wiped out by any later ratification of the act by the Catalan government. And this the defendant conceded at the oral argument quite frankly and deliberately.

■■ It may be noted further that the same result would follow under ordinary principles of agency law. We may put to one side the not inconsiderable problems as to whether the "tranquilizing" steps taken by the government were really intended as full ratification,[1] or, indeed, whether that was possible, since confiscation is obviously an act of sovereignty not available, even in part, to private parties,

---

[1] Though the Legal Adviser of the State Department in Washington did assume to construe the Catalan declaration of October 17, 1936, as an "assumption of responsibility," it will be observed that the actual language used, as quoted above, was of a decidedly more limited tenor.

cf. Brown v. United States, 12 U.S. 110, 8 Cranch 110, 122, 3 L.Ed. 504, or further whether any ratification could be had of an act not claimed to have been done on behalf of the now assumed principal (Restatement, Agency, 1933, § 85; Valaske v. Wirtz, 6 Cir., 106 F.2d 450, 124 A.L.R. 889, with cases cited at 893, 895, contra),[2] and rest our conclusion only upon the well settled rule that ratification does not date back to destroy intervening rights of third persons or otherwise to achieve an inequitable result. Restatement, Agency, 1933, §§ 89, 101(c); Cook v. Tullis, 85 U.S. 332, 18 Wall. 332, 21 L.Ed. 933; Parmelee v. Simpson, 72 U.S. 81, 5 Wall. 81, 18 L.Ed. 542; People ex rel. Goldschmidt v. Board of Education, 217 N.Y. 470, 112 N.E. 167; 1 Williston on Contracts, Rev.Ed. 1936, § 278A. It is true that this is normally an option of the third persons involved, Restatement, Agency, § 89, supra; and had the plaintiffs been acting solely for themselves in pressing for reimbursement by the Catalan government, this rule might not be applicable in their favor. Where, however, as here, they were under a duty to reduce the loss as much as possible, their already accrued rights could not be destroyed by the later events.

Defendant makes the further claim that plaintiffs have shown no legal loss under the circumstances, and that if in truth they have suffered any pecuniary loss it is due not to the risk assumed, but entirely to the fall of the peseta, the standard medium of currency of Spain and Catalonia. This claim has three aspects: (1) That the settlement made by the Catalan government gave the plaintiffs more pesetas than the number which would represent the value of the cotton when taken and hence in fact a gain rather than a loss resulted; (2) that any loss accruing to the plaintiffs on reduction of the pesetas received to American money was without the coverage of the policy by reason of a provision expressly excepting claims for "delay, deterioration, loss of market or any consequential loss," it being argued that such loss was merely consequential on the decline in the value of the peseta in American money; and (3) that there being no proof of the value of the peseta on October 6, 1936, there was no proof of the market value of the cotton at that date and hence of loss under the policy.

The clause of the policy which must govern here provides: "Loss, if any, payable on the basis of the actual market value at time and place of loss, such loss, shall be payable in New York Exchange to Banks, Bankers and other parties as interest may appear." The premiums charged on the policy were on the basis of monthly reports by the assured as to the value of the cotton, and plaintiffs had declared its value in September, 1936, as $88 per bale. The parties have agreed that the average market value of the cotton on September 21, 1936, in Barcelona was 645 pesetas per bale, which, at the then rate of exchange of $0.1365, would be equivalent to $88 per bale, or for the 350 bales in question a total of $30,800 (225,750 pesetas). This rate of exchange had existed in August and through September 21; from September 22 through November 13, 1936, there were no exchange rates available, as foreign exchange in pesetas was temporarily suspended. Thereafter there was a marked decrease in the value of pesetas in United States dollar exchange, from $0.0884 on November 14 to $0.0753 and $0.0748 on December 15 and 16. The settlement made by the Catalan government was actually in the sum of 292,518.85 pesetas. Plaintiffs, however, could not obtain even the quoted rates in New York and eventually accepted an offer from the National City Bank, based on rates of 6 and 6½ cents, which yielded $18,632.39. No question is raised by defendant that plaintiffs failed to exercise due diligence in obtaining the highest price available. The judgment below was for the difference between the sum received and the value of $30,800, namely, $12,167.61, with interest from October 6, 1936.

Defendant's contention that plaintiffs actually received from the Catalan government more than they lost is based on the premise that market value at Bar-

2 Here the difficulty was not only that the Cotton Committee was not shown to have any real official standing (it was not even claimed to be connected with the Catalan government), but also that the Labor Committee never purported to act for it or in its name. The Labor Committee's proclamation shows that it was acting for itself in the light of its own ideas of public need and of law and order; its statement of intention to make "delivery" to the Cotton Committee was clearly earnest of its disinterested purpose, rather than proof of its agency status.

celona must mean value in pesetas, and hence that plaintiffs have actually received over 66,000 more pesetas than that value at or near the time the cotton was seized. But the policy does not provide for the computation of market value in the currency of the place; it provides only that the actual market value shall be payable in New York Exchange. The obvious intent of the parties was that, however the actual market value should be ascertained, it should then be translated into New York Exchange. Hence, if as a matter of convenience of computation the loss on October 6 was initially found in terms of pesetas, it must then be translated into New York Exchange as of that date. The resulting value in New York Exchange is, therefore, the amount of the loss under the contract. This, it seems, would be the rule in the absence of contract; it is made doubly clear by the express provision. Cf. Nussbaum, Money in the Law, 1939, 464; Hicks v. Guinness, 269 U.S. 71, 46 S.Ct. 46, 70 L.Ed. 168; The Verdi, D.C. S.D. N.Y., 268 F. 908, A. N. Hand, J.; Fraenkel, Foreign Moneys in Domestic Courts, 35 Col. L. Rev. 360, 386; Rifkind, Money as a Device for Measuring Value, 26 Col. L. Rev. 559.

■ Nor does the fact that the local medium of currency thereafter declined make this a consequential loss within the meaning of the policy exception. That exception, as its context shows, is obviously designed to prevent claims for delays and changes in market conditions and losses which do not flow from actual fire or from seizure of the physical goods under the other provisions of the coverage. It therefore limits the coverage to direct injuries to the cotton. Thus, it limits the acts which constitute breaches of the policy, not the damages which are to be awarded once a breach has been established. It is not applicable here. Cf. Wilson Bros. Bobbin Co. v. Green, [1917] 1 K.B. 860, 863.

■ Defendant's final contention of failure of proof of loss as of October 6, 1936, because of absence of quoted exchange for the peseta on that date, also rests on the premise that the actual market value of the cotton must be computed in terms of pesetas. But, as already pointed out, the policy provision does not so provide. While the peseta may be a convenient yardstick for the computation of value, there is nothing in the contract to make it the only standard of value or to render the cotton valueless except as and unless the peseta was quoted in American money. Since the parties are agreed that the cotton was worth $30,800 in New York Exchange on September 21, the court was reasonably justified in concluding—in the absence of evidence to the contrary other than lack of international trading in the peseta—that no change in its value had occurred by October 6. There is nothing to indicate that that value was not obtainable locally in pesetas or other medium of exchange or by barter. Certainly it would be a far-fetched and a harsh conclusion to rule that the cotton in effect had lost all value in this short period by the mischances which loss of foreign confidence had brought to the peseta. The probabilities were, as, indeed, later events showed, that the decline in worth of the peseta would lead to an increase in the quoted local value of the cotton; and while these were not likely to be exactly offsetting, yet they do suggest that a decline in value of the medium of exchange cannot be assumed to show an absence of value of the cotton. Hence the court was justified in accepting the value of the cotton lost as $30,800, and the value of the salvage, computed in the standard set by the policy, to wit, New York Exchange, as $18,632.39, and in giving judgment for the difference with interest.

Judgment affirmed.

L. HAND, Circuit Judge (dissenting).

The case turns upon whether the seizure by the "Labor Committee"—which, I agree, was a conversion of the cotton—eventually became a "confiscation * * * by duly constituted governmental or civil authorities"; and whether that was enough, confiscation being initially equivocal. Upon that I can find no authority, nor should I indeed expect to find any; the question is how we shall read the words in this particular context. The risk insured against was only of lawless violence, except in the case of "Explosion." A seizure by an agency on behalf of a government, though not then authorized, whose act that government later adopts as its own, appears to me not to be within that risk, and I read the exception in confirmation of that conclusion. That does make liability depend upon a later event—if the "governmental or civil authorities" do not

adopt the act, it is not a confiscation—but I can see no difficulty in that. There remains the question of the interpretation of the stipulation: i. e., whether we should say that the "Labor Committee" did seize the cotton on behalf of the Catalan Government conditionally upon that government's adoption of the seizure as its own. It seized it for "delivery" to the "Cotton Committee," and while the status of that body is more amorphous than I could wish, we do have it that it was "semi-official," "duly constituted" and "depending" on the government at Madrid. Formally, there is a difficulty that the "Cotton Committee" "depended" upon the Madrid government, not upon the Catalan; but nobody has suggested that as a valid distinction, and I pass it. If it is not, the later action of the Catalan government was a full adoption of the act of the "Labor Committee," made upon behalf of the subsidiary agency, the "Cotton Committee," and so of itself. The letter of our State Department says that the Catalan government "sanctioned" the seizure "with assumption of responsibility." That in my judgment was all that it could do, and quite enough.